280

THE PORTO RICO RACING CORPORATION, demandante y apeapelante, *v.* LA COMISIÓN HÍPICA INSULAR, compuesta de su Presidente, F. J. RICHARDSON, MARIANO ABRIL, TESORERO y ANTONIO ARROYO, Vocal, demandada y apelada.

No. 4379.—*Visto:* Noviembre 18, 1928. *Resuelto:* Mayo 31, 1928.

*Félix Córdova Dávila* y *A. Díaz Viera,* abogados de la apelante; *Attorney General George C. Butte* y *Guerra Mondragón & Soldevila,* abogados de la apelada; *Feliú & La Costa* y *F. Ochoteco,* abogados de Las Monjas Racing Corporation, interventora apelada.

El Juez Asociado Señor Hutchison, emitió la opinión del tribunal.

El 29 de julio de 1927, la Porto Rico Racing Corporation entabló demanda de *injunction* para impedir que se pusiera en vigor una resolución o regla adoptada por la Comisión Hípica Insular. De acuerdo con esta regla, se le exigía a la peticionaria, para poder celebrar sus carreras de caballos, que se sometiera a turnos de aproximadamente seis meses cada uno con su competidora, Las Monjas Racing Corporation.

La Comisión Hípica Insular contestó la petición arriba mencionada, así como una solicitud para que se expidiera un auto preliminar de *injunction,* y en la misma alegación contestó una orden para mostrar causa, admitiendo ciertas alegaciones, negando otras e insistiendo en el derecho, poder y autoridad que según la Ley de 1927 tenía para adoptar y poner en vigor la regla en cuestión.

Durante la vista de la orden para mostrar causa por la cual no debía expedirse el *injunction* preliminar, compareció Las Monjas Racing Corporation solicitando se le permitiera intervenir como parte demandada; y, con el consentimiento de las partes originales en el pleito, se declaró con lugar esa petición. La nueva demandada entonces excepcionó la demanda por varios fundamentos, los cuales no es necesario enumerar ahora. La corte declaró sin lugar las excepciones previas, ordenó la radicación por la interventora de su contestación, y expidió una orden de entredicho *(temporary restraining order)* hasta tanto se celebrara la vista de la petición solicitando la expedición del *injunction* preliminar.

En agosto 15, 1927, después de haberse celebrado una vista en la que se adujo prueba, y después de considerar los

alegatos sometidos por los abogados, se autorizó la expedición del auto preliminar de *injunction,* siempre que la peticionaria prestara una fianza por la suma de $10,000 para responder de los daños y perjuicios que pudieran irrogarse a Las Monjas Racing 'Corporation, así como a la demandada original, en caso de que la resolución final de las cuestiones envueltas fuera adversa a la peticionaria.

Dos días después, la Comisión Hípica enmendó su resolución concediendo turnos alternados de tres días cada uno, en vez de turnos de 33 días de carreras cada uno (aproximadamente seis meses), y la regla fué aprobada por el Gobernador el 22 de agosto de 1927, tal como fué enmendada. El 24 de agosto se celebró una vista final y se anuló el auto preliminar anteriormente expedido, se declaró sin lugar la petición para que se expidiera un auto de *injunction* permanente, y se concedieron las costas a las demandadas, por las razones que a continuación se expresan:

"El artículo 5 de la Ley Hípica de Puerto Rico, que es como se designa la Ley No. 40 de 1927, dice textualmente así:

" 'La Comisión Hípica Insular estará facultada para prescribir el reglamento por el cual deberá regirse la celebración de carreras en los hipódromos y será puesto en vigor, previa aprobación del Gobernador de Puerto Rico y sin perjuicio de que sea revisado o revocado por la Asamblea Legislativa de Puerto Rico.

" 'La Comisión Hípica Insular dictará reglas para regular los contratos entre los dueños de caballos y *jockeys.*'

"Un estudio juicioso de este artículo de la Ley, examinándolo en relación con el artículo 8 de la misma, nos lleva a la conclusión de que la Asamblea Legislativa de Puerto Rico ha hecho una delegación absoluta y completa de todos sus poderes en la Comisión Hípica Insular, autorizándole para establecer, sin condición o cortapisa alguna, aquellas reglas que estime necesarias y convenientes para la *celebración de carreras* en los hipódromos de Puerto Rico concordantes con el propósito de la ley de regularizar el deporte hípico. Tal delegación está subordinada solamente a dos requisitos: el primero, que dichos reglamentos, antes de ser puestos en vigor, deberán ser aprobados por el Gobernador de Puerto Rico; y el segundo, que la Asamblea Legislativa de Puerto Rico se reserva el

derecho de revisar o revocar los reglamentos que adopte la Comisión Hípica.

"La demandante hace hincapié en el hecho de que la Ley No. 40 es una adaptación o incorporación en todos sus preceptos de la Ley No. 21 de 1925, toda vez que en esta Ley de 1925 existía un artículo, el número 5, que lee como sigue:

"'Asimismo se faculta a la Comisión Hípica Insular para fijar turnos para la celebración de carreras, cuando existan dos o más hipódromos dentro de una misma municipalidad.'

"Si nos fijamos en la palabra inicial de este artículo,—'asimismo' —veremos que en esta Ley No. 21 la Legislatura, además de los poderes que le daba a la Comisión por el artículo 4, le facultaba para fijar turnos constituyendo tal delegación un claro, manifiesto y expreso propósito del legislador. Pero al derogar la Asamblea Legislativa la Ley No. 21 de 1925, en la que figuraba este artículo, promulgando en su lugar la Ley No. 40 de 1927, y no hacer mención alguna en esta ley en cuanto a la facultad de fijar turnos, ¿cuál fué su propósito? ¿Quiso negarle expresa, manifiesta y claramente a la Comisión Hípica el poder para fijar turnos? Si tal hubiera sido su intención, lo hubiera dicho expresamente. Cuando así no lo hizo es porque creyó que estaba dentro de los poderes generales de reglamentación que para la celebración de carreras le daba a la Comisión Hípica.

"Un reglamento es un cuerpo de instrucciones o reglas que se promulgan por escrito para la ejecución de una cosa. Promulgado el reglamento y aprobado por el Gobernador, la facultad de revisarlo o revocarlo se la ha reservado para sí la Asamblea Legislativa de Puerto Rico, y tal reserva debe ser respetada por el poder judicial.

"No podemos arrancar el proceso histórico del artículo 5 de la Ley No. 40 de 1927 de los preceptos contenidos en la Ley No. 21 de 1925. El artículo 1 de la Ley No. 40 deroga expresamente toda la Ley No. 21 de 1925, y si bien para la interpretación de un estatuto, el estudio de otras leyes, aun derogadas, *in pari materia,* puede ser hecho por el tribunal para cerciorarse del verdadero propósito o intención del legislador, cuando la letra de la ley es clara y libre de toda ambigüedad, su letra no debe ser menospreciada bajo el pretexto de cumplir su espíritu.

"Si la Ley No. 40 de 1927 fuera enmendatoria de la No. 21 de 1925, sería un argumento convincente el de la parte demandante; pero desgraciadamente para ella, no es así. La Ley No. 40 de 1927, al derogar todas las leyes hípicas anteriores, creó un nuevo código,

sin antecedentes históricos algunos, y a esta Ley No. 40 debemos darle la interpretación y eficacia que una ley tiene. Esta Ley No. 40 de 1927 no es ni siquiera una adaptación de la Ley de 1925, porque aun cuando su propósito fué el mismo, esto es, crear una Comisión Hípica y reglamentar el deporte hípico, la nueva ley tiene preceptos radical y fundamentalmente distintos a los de la Ley de 1925, y aun cuando es cierto que en la nueva ley no se da facultad a la Comisión para fijar turnos en los hipódromos, tampoco hay precepto alguno que de modo expreso le prohiba que tal haga. Las facultades que ha delegado la Asamblea Legislativa en la Comisión Hípica para reglamentar el deporte hípico no tienen limitación alguna: son todo lo vastas y amplias que pueden ser; y la mejor prueba de que la intención de la Asamblea Legislativa fué conceder estos vastos poderes a la Comisión Hípica la encontramos en la expresa reserva que para sí hace la Asamblea Legislativa de revisar o revocar dicho reglamento. No puede concebirse una intención más claramente expresada.

"El medio más eficaz y universal para descubrir el verdadero sentido de una ley, cuando sus expresiones son dudosas, es considerar la razón y espíritu de ella, o la causa o motivo que indujeron al poder legislativo a dictarla. El fin primordial de esta Ley No. 40 es regularizar el deporte hípico. Y dentro del poder de reglamentar,—o regularizar, como dice la ley—la Comisión Hípica Insular puede adoptar todas aquellas medidas que, a su juicio, estime convenientes y necesarias al deporte, toda vez que las mismas han de ser objeto de revisión o revocación por la Asamblea Legislativa.

"Pudiera argumentarse que la resolución objeto de este asunto tiende más bien a reglamentar los hipódromos y no la celebración de carreras, pero un ligero estudio de la resolución nos convencerá de lo contrario. La resolución enmendada, que es la única que debemos considerar, dice en su parte pertinente:

" 'Las carreras de caballos en los hipódromos denominados 'Las Monjas Racing Club' y 'Quintana Racing Park' se celebrarán por turnos alternados de tres días consecutivos de carreras cada uno . . . . mientras no se disponga otra cosa por la Comisión.'

"Esta es una reglamentación para las *carreras* que se celebren en los hipódromos 'Quintana' y 'Las Monjas' y no una reglamentación de los hipódromos.

"Cuando nos encontramos en presencia de una intención legislativa tan marcadamente clara y expresada en términos tan concretos, no estimo que sea adecuado para un tribunal de equidad el no respetar la intención del legislador. Tal intención debe ser el primer

paso a considerar por el tribunal cuando ha de interpretar una ley, y la intención aquí está manifiesta.

"Los casos citados por las partes de *Grannan* v. *Westchester Racing Assn.*, 153 N. Y. 643; *State Racing Commission* v. *Latonia Agricultural Assn.*, 35 L.R.A. (N. S.) 905; y *Grainher* v. *Douglas Park Jockey Club* 148 Fed. 513, discuten cuestiones distintas a la aquí levantada, interpretando preceptos de ley radicalmente distintos a los nuestros.

"La misma Legislatura de 1927 votó la Ley de 1925. Ella sabía que los preceptos de la Ley No. 21 de 1925 quedaban derogados por los de la Ley No. 40 de 1927. Si fué su intención el limitar los amplios poderes concedidos a la Comisión Hípica en el sentido de que ésta carecía de facultad para fijar turnos a los hipódromos, debió haberlo dicho así. Cuando no lo dijo es porque dentro del poder general de reglamentación lo quiso abarcar todo, sujeto a su revisión o revocación.

"La intención de la Legislatura debe ser respetada por este tribunal. Es como puede funcionar armónicamente un gobierno establecido bajo la independencia de los tres poderes: legislativo, ejecutivo y judicial.

"La Corte entiende que la resolución adoptada por la Comisión Hípica Insular fijando turnos no tiene el carácter de confiscatoria, irrazonable o arbitraria que se le atribuye, sino que cae dentro del amplio ejercicio del poder policial que de modo expreso le ha delegado la Legislatura de Puerto Rico al concederle la facultad de prescribir el reglamento por el cual deberá regirse la *celebración de carreras* en los hipódromos de Puerto Rico. La Comisión tiene poderes para dictar reglas para la *celebración de carreras* y para las *carreras.*"

No podemos estar de acuerdo con esa conclusión.

▇▇▇▇ Las amplias (*sweeping*) aserciones contenidas en este extracto de la "relación del caso y opinión" radicada por el juez de distrito podrían, desde luego, ser rebatidas con manifestaciones en sentido contrario igualmente amplias. Tales manifestaciones en sentido contrario podrían ser suplementadas en el curso de la argumentación por numerosas frases y cláusulas segregadas del contexto y tomadas de distintas leyes sucesivas, con el fin de justificar una conclusión distinta.

Sin embargo, hay mucho campo para argumentación en ambos extremos de la cuestión, y los letrados de las partes en este caso han dedicado considerable tiempo y trabajo al estudio del mismo.

Por tanto, expondremos lo necesario sobre la historia, progreso y desarrollo del deporte hípico en Puerto Rico para indicar en forma general el curso de la legislación sobre la materia. No trataremos de incluir todos los aspectos o detalles de tal legislación.

La ley titulada "Ley para crear una Junta Insular de Ferias que tenga por objeto celebrar anualmente una exposición de industrias agrícolas y en general lucrativas, de la isla, y para otros fines," aprobada el 10 de marzo de 1910, no hace referencia en absoluto a hipódromos, comisiones hípicas o carreras de caballos. El artículo 6 de dicha ley, según fué enmendada tres años más tarde, Leyes de Puerto Rico de 1913, pág. 147, dice, en parte, como sigue (bastardillas nuestras):

"La Junta Insular de Ferias queda autorizada para contratar o arrendar el hipódromo y las pertenencias de éste en los terrenos de la Feria Insular a cualquiera corporación o asociación con la debida licencia para celebrar carreras, en la forma que más adelante se dispone en la presente.

"Por la presente se establece una Comisión Hípica Insular, que se compondrá de tres miembros, nombrados por el Gobernador de Puerto Rico, quienes prestarán sus servicios sin remuneración.

Dicha Comisión estará facultada para prescribir las reglas, reglamentos *y condiciones* por las cuales deba regirse la celebración de carreras en esta isla, y no podrá celebrarse ninguna si no fuere por una corporación o asociación debidamente autorizada por dicha Comisión. Toda corporación o asociación que deseare celebrar dichas carreras podrá solicitar anualmente la licencia correspondiente. *Si a juicio de la Comisión se hubiere justificado la expedición de la licencia, podrá otorgar* ésta por el término de un año, y toda licencia contendrá la condición de que toda carrera que en virtud de la misma se celebre estará subordinada a las reglas, reglamentos *y condiciones que de tiempo en tiempo prescribiere la Comisión, siendo* revocable por ésta *por cualquiera infracción de la referida licencia,*

o *siempre que la Comisión considere que la vigencia de ella no es conveniente a los intereses hípicos. Disponi-ndose,* que una negativa de conceder a cualquier corporación o asociación hípica una licencia, o *de asignar a una corporación o asociación hípica por lo menos cuarenta días en cada año,* si se desearen para celebrar carreras por dicha asociación, así como la decisión de la Comisión de revocar cualquier licencia de cualquier asociación, podrán ser objeto de revisión por las Cortes de la Isla, *y disponiéndose además,* que las corporaciones o asociaciones que estuvieren registradas en la Secretaría de Puerto Rico, para el funcionamiento de hipódromos, no tendrán necesidad de nuevas licencias, para el fin indicado, sin embargo, estarán sujetas a las reglas que adopte la Comisión Hípica Insular que por la presente Ley se crea.

''Toda fiesta hípica, en la cual se permitieren carreras por cualquier posta, premio o recompensa, excepto en la forma que se permite por esta Ley, se declara por la presente ser un estorbo público (*nuisance*), y toda persona que actúe en ella o que a ella coadyuvare, se le considerará culpable de delito menos grave (*misdemeanor*) y será castigada con multa de no menos de quinientos ni más de mil dólares por cada día de fiesta hípica o de carreras, y además, en la demanda que se interponga para el objeto por la Comisión Hípica Insular en una Corte de competente jurisdicción, donde se proponga celebrar las carreras no autorizadas, podrá obtenerse un *injunction* para impedirlas.''

Tres años más tarde, en 1916, la Legislatura Insular (Leyes de ese año, pág. 97) aprobó la ''Ley para prohibir la explotación de bancas alemanas, *pools,* o el sistema conocido por *pari mutuel* y la formación de libros de apuestas fuera de los hipódromos de la Isla.''

De acuerdo con los términos del artículo 1º., se prohibe y declara ilegal el negocio de venta de billetes para apuestas en la forma de los llamados *pools* y la formación de libros de apuestas y de bancas alemanas, excepto en la manera autorizada por las disposiciones de dicha ley. El artículo 2 autoriza tal negocio solamente en los días en que se celebren carreras de caballos, en relación con dichas carreras, y solamente en ciertos sitios dentro de los hipódromos.

El artículo 3 dispone que ninguna asociación o corporación permitirá bancas alemanas y *pari mutuel* o apuestas en

ningún sitio dentro de sus terrenos fuera de aquellos oficialmente designados para los fines de las apuestas; y que ninguna persona no autorizada para ello venderá o tratará de vender billetes de ninguna clase o forma de combinación o apuesta dentro de los hipódromos. El artículo 4 dice que cada hipódromo dispondrá lo necesario de manera que las apuestas puedan verificarse en sitios aislados, sujetos a la aprobación de la Comisión Hípica Insular. Según el artículo 5, ninguna persona venderá, cederá o en forma alguna suministrará ningún billete, participación o interés, u otra evidencia de tenerse interés en cualquier *pool* o combinación que dependa del resultado de cualquier carrera o carreras de caballos excepto en los sitios y en la forma permitidos por dicha ley. El artículo 6 prohibe que se ayude o patrocine el establecimiento, dirección o juego de *pools* o *pari mutuel* u otros juegos que dependan del resultado de cualquier carrera o carreras de caballos en contravención de la citada ley. El artículo 7 prohibe el sostenimiento de cualquier oficina para la preparación o inscripción de ciertos billetes o listas, excepto en los sitios y en la forma prescritos. El artículo 8 autoriza la expedición de órdenes de allanamiento bajo ciertas circunstancias que se especifican. El artículo 9 fija responsabilidad por las reclamaciones hechas por personas que juegan dentro de los hipódromos autorizados. El artículo 10 prohibe la venta de billetes para apuestas a menores o la admisión de dichos menores en los sitios designados para las apuestas. El artículo 11 dispone que todos los establecimientos donde se vendan billetes para apuestas, en la forma especificada, estarán en todo tiempo bajo la inspección de la Comisión Hípica y de la Policía.

El Gobernador queda autorizado para suspender, por justa causa, y por cualquier período de tiempo que no exceda de quince días consecutivos, cualquier clase de apuestas o juegos de azar dentro de los sitios designados especialmente para ese fin.

El artículo 12 autoriza el secuestro, confiscación y destrucción de todos los implementos, aparatos o materiales empleados, por orden de la corte, en ciertos casos. El artículo 13 dispone la convicción y castigo de toda persona o personas que infringieren lo estatuido en la ley antes citada.

Al siguiente año, el artículo 11, *supra,* fué enmendado extendiendo el período máximo de quince días consecutivos a un período que no exceda de tres meses consecutivos. (Leyes de 1917, página 247.) Al mismo tiempo se derogó el artículo 13 de la ley de 1916, y se adoptaron los artículos 13 (*a*) a 13 (*g*), inclusive, en lugar del artículo derogado. El artículo 13 (*a*) dice que la Comisión Hípica designará un funcionario con el fin de inspeccionar en todo los días de carreras la administración de las bancas y del llamado *pool.* Determina que este funcionario estará acompañado de dos agentes de la policía, y que será su deber comunicar todas las infracciones de esta ley a la Comisión Hípica Insular, y, mediante la autorización de la comisión, presentará denuncia ante la corte correspondiente. También podrá ejercer los poderes que de acuerdo con la ley que autoriza su nombramiento, le confiera la Comisión Hípica. El artículo 13 (*b*) autoriza el nombramiento de un jurado por la Comisión Hípica, el cual, además de las funciones que le confiere el reglamento, tendrá el deber de comunicar todas las infracciones de dicha ley de que tuviere conocimiento a la Comisión Hípica Insular, y, mediante autorización de dicha Comisión, podrá presentar denuncias ante el tribunal correspondiente, y, como tal jurado, tendrá la completa dirección de las carreras. El artículo 13 (*c*) castiga como *misdemeanor* el que todo *jockey* impida que el caballo por él montado gane, o que use cualquier droga como estimulante. Fija las penas por la comisión de tales delitos y por la instigación a que los mismos se cometan. También se confiere autoridad al Jurado para suspender provisional o definitivamente, de acuerdo con la Comisión Hípica Insular, a cualquier *jockey* o *jockeys*. Provee el ar-

tículo 13 (*d*) ciertas deducciones de las cantidades apostadas para la formación de un fondo de depósito para fines benéficos. El artículo 13 (*e*) especifica el castigo que se impondrá a las personas que infrinjan cualquiera de las disposiciones de la ley en cuestión, a excepción de lo que provee el artículo 13 (*c*). El artículo 13 (*f*) prohibe que ciertos empleados y funcionarios sean dueños de caballos, y prohibe además que sean funcionarios para las carreras los dueños de caballos, los miembros de una asociación hípica y los miembros de la Comisión Hípica. El artículo 13 (*g*) exige que la Comisión Hípica celebre por lo menos una sesión al mes, autoriza sesiones extraordinarias, y fija la dieta que como remuneración recibirán los miembros que asistan a tales sesiones.

La Ley de 1923 (Leyes de ese año, pág. 635) es una combinación o re-adopción de las varias disposiciones contenidas en las leyes de 1913, 1916 y 1917, con ciertos cambios y algunas pequeñas innovaciones. El artículo 4 lee como sigue (bastardillas nuestras):

"Por la presente se establece una Comisión Hípica Insular que se compondrá de cinco miembros nombrados por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado de Puerto Rico por el término de dos años. El cargo de miembro de la Comisión Hípica Insular se declara incompatible con cualquier cargo público retribuido por el Gobierno Insular o de los Estados Unidos. Dicha Comisión estará facultada para prescribir las reglas y condiciones por las cuales deba regirse la celebración de carreras en esta isla. Toda persona natural o jurídica que deseare celebrar carreras deberá solicitar de la Comisión Hípica Insular la licencia correspondiente. *Si a juicio de la Comisión se hubiere justificado la expedición de la licencia, podrá otorgar* ésta *por el término de un año* y toda licencia contendrá la condición de que toda carrera que en virtud de la misma se celebre, estará subordinada a las reglas *y condiciones que de tiempo en tiempo prescribiere* la Comisión. La licencia referida podrá *por justa causa* ser revocada por la Comisión Hípica Insular.

"La Comisión Hípica Insular nombrará tres jueces, quienes formarán el jurado que ha de velar porque las reglas que dictare dicha Comisión para el funcionamiento de las carreras sean cumpli-

das, y las decisiones de dicho jurado serán apelables únicamente ante la Comisión Hípica Insular, excepto en lo que respecta a la salida y al orden de llegada de los caballos en cada carrera. En adición de dichos tres jueces la Comisión Hípica Insular *nombrará para cada hipódromo en que se celebren carreras* los siguientes oficiales: un secretario del jurado, un juez de *paddock*, tres jueces de pista, un juez de peso y un oficial de tiempo (*time-keeper*). Además *nombrará para cada hipódromo, a propuesta de los directores de éstos,* un *starter* y un *assistant starter*.

"La Comisión Hípica Insular rendirá un informe anual al Secretario Ejecutivo del resultado de todas sus gestiones durante el año.

"Cada miembro del jurado devengará dieta a razón de veinte (20) dólares por cada día de carreras, pagada de los fondos de la Comisión Hípica Insular. En todas las cuestiones que tuviese que resolver dicho jurado como cuerpo, la decisión de la mayoría será concluyente: entendiéndose que, tanto las corporaciones o personas explotadoras del negocio de hipódromos, como los dueños de caballos o cualesquiera otros intereses, quedarán supeditados a dichas decisiones.

"Las decisiones de la Comisión Hípica Insular serán obligatorias para toda persona natural o jurídica que explote el negocio de hipódromo; *Disponiéndose,* que ningún reglamento para el gobierno interior de tales hipódromos será válido si no hubiere sido debidamente aprobado por la Comisión Hípica Insular.

"Toda fiesta hípica en la cual se permitieren carreras por cualquier posta, premio o recompensa, excepto en la forma que se permite por esta Ley, se declara por la presente ser un estorbo público (*nuisance*) y toda persona que actúe en ella o que a ella coadyuvare, se le considerará culpable de delito menos grave (*misdemeanor*) y será castigada con multa de no menos de quinientos (500) ni más de mil (1,000) dólares por cada día de fiesta hípica o de carreras y, además, en la demanda que se interponga para el objeto de la Comisión Hípica Insular en una corte de competente jurisdicción, donde se proponga celebrar las carreras no autorizadas, podrá obtenerse un injunction para impedirlas."

El artículo 16 estatuye que "la Comisión Hípica Insular por justa causa, podrá suspender en cualquier tiempo las jugadas en los *pools,* bancas alemanas o *pari mutuel,* dentro de los sitios especialmente designados para dichos fines,

dentro de cualquier hipódromo de la Isla, y podrá también por justa causa revocar la licencia expedida a cualquier persona natural o jurídica, para la explotación de carreras de caballos, pero tales suspensiones no serán en ningún caso por un período mayor de tres meses consecutivos.''

El artículo 20 clasifica los caballos de carreras como importados pura sangre o *thoroughbreds* y nacidos en el país. Elimina la competencia entre los dos grupos de caballos y exige que se celebren por lo menos tres carreras de caballos del país en cada día de carreras.

El artículo 21 dispone que la Comisión Hípica llevará un libro-registro de caballos y que expedirá licencias a los caballos inscritos mediante el pago de cierta cuota y previo el cumplimiento de los requisitos exigidos por el reglamento. También dispone que todo dueño de caballo, establo, o *jockey*, habrá de proveerse de una licencia similar. Los párrafos 3°. y 4°. de este artículo definen ciertos delitos y prescriben las penas por infracción de los mismos.

El artículo 22 se refiere a la disposición que ha de hacerse de las sumas recaudadas por concepto de multas y de la expedición de licencias. Según el artículo 23, se ordena al Tesorero de Puerto Rico velar por el cumplimiento de la ley en lo que atañe a la distribución de los fondos derivados por concepto del descuento de las jugadas mencionadas en los artículos anteriores pudiendo a tal efecto requerir a la Comisión Hípica Insular para que produzca sus libros, *récords* y cualquier otro documento que fuera necesario El artículo 25 fija una dieta de $20 para cada miembro de la Comisión.

En 1925, (Leyes de ese año, página 147) los 28 artículos de la Ley de 1923 se convierten en 55 artículos, pero el campo cubierto por ambas leyes es substancialmente el mismo. Entre las nuevas disposiciones hallamos las siguientes:

Según el artículo 26, la Comisión Hípica Insular podrá negarse a inscribir el nombre de un caballo nuevo en el registro de caballos (*studbook*) en determinados casos. Según

el artículo 29, la Comisión Hípica Insular marcará con un sello de hierro candente todos aquellos potros que se inscriban dentro de los 180 días de su nacimiento. También prescribe en detalle el tamaño máximo y el número de letras o figuras que deben ser usadas en los sellos, la forma en que se fijará la marca y la pena que se le impondrá a cualquier dueño de caballo que se niegue a permitir que se marquen sus caballos.

El artículo 30 dispone que las licencias expedidas por la Comisión Hípica Insular obligan a los dueños de hipódromos a permitir que los caballos a que las mismas se refieren concurran a las carreras que se celebren. El artículo 40 prohibe que se sellen o inscriban los impresos de combinaciones para el *pool,* a excepción de ciertos casos que se expecifican.

El artículo 42 prohibe la venta de billetes o formas de combinación o apuesta dentro de los terrenos de los hipódromos por cualquier persona que no tuviera autorización para ello.

El artículo 51 autoriza la retención de uno, dos, tres o cuatro centavos, o fracción de centavos, al pagarse los dividendos de las bancas y del *pool.* Y el artículo 21 prescribe ciertos recursos judiciales.

Con el fin de facilitar la comparación, procederemos a copiar íntegramente los artículos 2 al 12, inclusive, además de los subtítulos: (bastardillas nuestras)

''COMISIÓN HÍPICA INSULAR.

''Artículo 2.—Por la presente se establece una Comisión Hípica Insular que se compondrá de cinco miembros nombrados por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado de Puerto Rico, por el término de dos años. En adición a los referidos cinco miembros de la Comisión Hípica Insular, habrá dos miembros más, quienes tendrán voz, pero no tendrán voto: uno en representación de *los hipódromos en explotación en Puerto Rico,* el cual será designado por la persona o personas naturales o jurídicas que fueren dueñas de dichos hipódromos, y el otro, en representación de las asociaciones de dueños de caballos de carreras que se encuentren debidamente inscritas en la Secretaría Ejecutiva de Puerto Rico. A tal efecto, los secretarios de *las distintas corpora-*

*ciones explotadoras del negocio de hipódromos* y los de las asociaciones de dueños de caballos mencionadas, una vez constituida la Comisión Hípica Insular, certificarán a dicha Comisión los nombres de las personas que hayan sido designadas por sus respectivas corporaciones o asociaciones para representarles ante la misma. La designación de tales representantes se hará por un término indefinido, hasta que la asociación o corporación que los nombró resuelva destituirlos o hasta que los mismos renuncien. El cargo de miembro de la Comisión Hípica Insular se declara incompatible con cualesquiera otro cargo público retribuido por el Gobierno Insular, Municipal o de los Estados Unidos.

"Artículo 3.—La Comisión Hípica Insular celebrará, por lo menos dos sesiones semanales y las sesiones extraordinarias que fueren necesarias, y cada uno de los cinco miembros de la Comisión Hípica Insular, nombrados por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado de Puerto Rico, devengará una dieta de quince (15) dólares por cada sesión a que asista, pero en ningún caso podrá ninguno de dichos miembros percibir más de ciento cincuenta (150) dólares, en ningún mes, por concepto de dietas. Estas dietas se pagarán de los fondos de la Comisión Hípica.

"FACULTADES DE LA COMISIÓN HÍPICA INSULAR

"Artículo 4.—La Comisión Hípica Insular estará facultada para prescribir las reglas *y condiciones* por las cuales deba regirse la celebración de carreras *en Puerto Rico, incluyendo todo aquello que se relacione con la forma en que deberán hacerse las apuestas en las bancas alemanas y pools,* y todo lo que se relacione con la inscripción de caballos en el *studbook.*

"*Se faculta además a la Comisión Hípica Insular para imponer aquellas correcciones que creyere convenientes por infracciones de su reglamento sobre carreras de caballos.*

"Los reglamentos de la Comisión Hípica Insular deberán ser aprobados por el Gobernador de Puerto Rico, y una vez que dicho funcionario les imparta su aprobación, tendrán fuerza obligatoria.

"La Comisión Hípica Insular deberá, en todo cuanto sea posible, seguir en sus investigaciones y actuaciones los procedimientos señalados en la ley a las cortes de justicia para la tramitación y despacho de sus asuntos.

"Artículo 5.—*Asimismo se faculta a la Comisión Hípica Insular para fijar turnos para la celebración de carreras cuando existan dos o más hipódromos dentro de una misma municipalidad.*

"Artículo 6.—Los miembros de la Comisión Hípica Insular quedan por la presente facultados para tomar juramentos en todos aquellos casos o asuntos que se relacionen con el cumplimiento de esta Ley y de su reglamento.

"NOMBRAMIENTOS DE FUNCIONARIOS PARA LAS CARRERAS Y EMPLEADOS DE LA COMISIÓN HÍPICA INSULAR

"Artículo 7.—La Comisión Hípica Insular nombrará *para cada hipódromo, a propuesta de los directores de éste,* los siguientes funcionarios: Tres jueces, quienes formarán el jurado en cada hipódromo; un *starter* y un *assistant starter;* un juez de peso; un secretario para el jurado; un juez de *paddock* y un *assistant* juez de *paddock;* cuatro jueces de pista; un *timekeeper;* un colector de multas; un juez de inscripciones; un ayudante abanderado; un veterinario; un inspector de monturas; jueces de *pool* y bancas, un instructor de *jockeys, y todos aquellos otros funcionarios que creyere necesarios para el mejor funcionamiento de las carreras,* y deberá asignarles el sueldo o dieta que creyere razonable. Además nombrará un secretario para la Comisión, y todos aquellos otros empleados que creyere necesarios para su oficina, asignándoles el sueldo; *Disponiéndose,* que ningún sueldo será mayor de ciento cincuenta dólares mensuales, con excepción del *starter* que no ganará más de setenta y cinco dólares por cada día de carrera.

"Todos estos sueldos y dietas se pagarán de los fondos de la Comisión Hípica Insular que más adelante se crean.

"IMPOSICIONES Y PAGO DE LICENCIAS

"Artículo 8.—Toda persona natural o jurídica que deseare celebrar carreras, deberá solicitar de la Comisión Hípica Insular la licencia correspondiente. *Una vez que dicha persona llenare los requisitos que, por reglamento,* exigiere la Comisión, *ésta le otorgará* la licencia *por el término de un año,* mediante el pago de la suma de trescientos (300) dólares. Toda licencia contendrá la condición de que toda carrera que a virtud de la misma se celebre, estará subordinada a las reglas prescritas por la Comisión.

"Artículo 9.—Todo dueño de caballos o establo deberá proveerse de una licencia que le expedirá la Comisión Hípica Insular, mediante el pago de una cuota de veinte (20) dólares por año, y cumplimiento de los requisitos que por reglamento exigiere la Comisión.

"Artículo 10.—Todo *jockey* deberá proveerse de una licencia que mediante el pago de una cuota de diez (10) dólares anuales y el cumplimiento de los requisitos que, por reglamento, exigiere la Comisión Hípica Insular, le será expedida por dicha Comisión.

"Artículo 11.—Todo cuadrero o *trainer* deberá proveerse de una licencia la cual le será expedida por la Comisión mediante el pago de una cuota de dos (2) dólares anuales y el cumplimiento de los requisitos que por reglamento exigiere la Comisión.

"REVOCACIÓN O SUSPENSIÓN TEMPORAL DE LAS LICENCIAS

"Artículo 12.—La Comisión Hípica Insular podrá, *por justa causa, previa audiencia de partes y oportunidad de defenderse,* suspender temporalmente o revocar la licencia de cualquier hipódromo, dueño de caballo, *jockey* o cuadrero."

La Ley de 1925 se titula (bastardillas nuestras): "Ley para derogar la Ley Número 86, aprobada en 11 de agosto de 1923; para crear una Comisión Hípica Insular *con facultades para reglamentar la celebración de carreras* e imponer ciertas penalidades por violación de sus reglamentos; para prohibir la explotación de bancas alemanas y *pools* y la, formación de libros de apuestas o el sistema conocido por *pari mutuel,* excepto en la forma y en aquellos sitios que en esta ley se permite, y para otros fines."

Y el título de la Ley de 1927, es el siguiente (bastardillas nuestras): "Ley para derogar la Ley No. 21 de 7 de junio de 1925," (se identifica esa ley) "y para establecer una Comisión Hípica Insular, *regularizar el deporte hípico,* y para otros fines."

Según los términos del artículo 3 de esta ley que aparece bajo el acápite de *"Comisión Hípica Insular,"* esa institución se reduce de una organización de siete miembros al número original de miembros prescrito por la Ley de 1913, y se compone ahora de un "Comisionado de Servicio Hípico Insular, que será Presidente de dicha Comisión, y dos comisionados asociados." El artículo 4 dispone que la Comisión celebrará por lo menos una sesión semanal ordinaria y las extraordinarias que sean necesarias, en vez de "dos sesiones semanales y las extraordinarias que sean necesarias," según disponía la ley de 1925. Los artículos 5 y 6 bajo el epígrafe *"Facultades de la Comisión Hípica Insular,"* el artículo 7,

*"Nombramiento de funcionarios,"* y el artículo 8, tomado del subtítulo *"Imposición y pago de licencias,"* así como el artículo 12, titulado *"Revocación o suspensión temporal de las licencias,"* leen en la actualidad como sigue (bastardillas nuestras):

"Artículo 5.—La Comisión Hípica Insular estará facultada para prescribir el reglamento por el cual deberá regirse la celebración de carreras en los hipódromos y será puesto en vigor, previa aprobación del Gobernador de Puerto Rico y sin perjuicio de que sea revisado o revocado por la Asamblea Legislativa de Puerto Rico.

"La Comisión Hípica Insular dictará reglas para regular los contratos entre los dueños de caballos y *jockeys.*

"Artículo 6.—La Comisión Hípica Insular tendrá facultades para imponer correcciones y castigos por infracciones de su Reglamento sobre carreras de caballos, y sus decisiones serán inapelables, y contra ellas no cabrá recurso judicial alguno ordinario ni extraordinario, a menos que se trate de la expulsión definitiva, o de la suspensión temporal por un período de tres o más meses, de los caballos, sus dueños, *jockeys, trainers,* cuadreros o cualquiera de ellos, en el cual caso podrán los perjudicados apelar ante las cortes de justicia; la apelación no suspenderá los efectos de la resolución apelada en ningún caso, salvo que se trate de la expulsión definitiva y en éste, sólo cuando por la corte de apelación se dicte un auto de *supersedeas* previa la prestación de fianza. *En las apelaciones de estos casos se seguirá el mismo procedimiento que por ley se fija a las apelaciones de las sentencias de las cortes municipales a las cortes de distrito, teniendo éstas jurisdicción para conocer de dichos recursos y siendo sus decisiones definitivas e inapelables.*

"*La Comisión Hípica Insular deberá, en todo cuanto sea posible, seguir en sus investigaciones y actuaciones los procedimientos señalados en la ley a las cortes de justicia para la tramitación y despacho de sus apuntes.* La Comisión Hípica Insular queda por la presente facultada para tomar juramentos en todos aquellos casos o asuntos que se relacionen con el cumplimiento de esta Ley y de su Reglamento. Las sesiones ejecutivas de la Comisión serán privadas pero las audiencias que conceda a las partes serán públicas.

"Artículo 7.—La Comisión Hípica Insular nombrará para cada hipódromo en explotación, a propuesta de los directores de éste, los siguientes funcionarios: tres jueces, quienes formarán el jurado, siendo el presidente elegido por el jurado, dentro de sus miembros, tres jurados suplentes, un secretario del jurado; dos jueces de

*pool* y bancas; un instructor de jockeys; cuatro jueces de pista,. un colector de multas y un *time-keeper.*

"Además nombrará un secretario para la Comisión y todos aquellos otros empleados que creyere necesario para su oficina, asig-- nando a todos ellos el sueldo o dieta que creyere razonable; *Dispo- niéndose,* que ningún sueldo o dieta será mayor de ciento cincuenta· (150) dólares mensuales, y todos estos sueldos o dietas se pagarán· de los fondos de la Comisión Hípica que más adelante se crean por esta Ley.

"Los directores de cada hipódromo estarán obligados a nombrar· un *starter* y un *assistant starter,* un juez de peso, un *assistant* juez· de peso, un juez de *paddock* y un *assistant* juez de *paddock;* un· *clocker,* un juez de inscripciones, dos ayudantes abanderados, un veterinario, un médico y un inspector de monturas. Al verificarse estos nombramientos, los directores del hipódromo comunicarán a la Comisión Hípica el nombre de las personas que hayan designado· para esos cargos *y sus sueldos serán pagados por los referidos di- rectores; Disponiéndose, que la Comisión Hípica Insular no podrá nombrar ni ordenar a la corporación que nombre para los hipódro- mos otros empleados en adición a los designados por esta Ley.*

"La Comisión Hípica Insular podrá remover a cualquier fun- cionario del hipódromo, nombrado por ella o por la corporación,. *por ineficiencia, negligencia en el cumplimiento de su deber o mala conducta en el desempeño de su cargo, dándole una copia de los· cargos que existan contra él y una oportunidad de ser oído en per- sona o por medio de abogado en su propia defensa dentro de los· diez (10) días siguientes a la fecha de la notificación de los cargos.*

"Artículo 8.—Toda persona natural o jurídica que deseare ce- lebrar carreras, deberá solicitar de la Comisión Hípica Insular la licencia correspondiente. *Una vez que dicha persona llenare los re- quisitos que, por reglamento, exigiere la Comisión, ésta le otorgará* la licencia sujeta al pago de la suma de trescientos (300) dólares *anuales.* Las licencias contendrán la condición de que toda carrera que a virtud de las mismas se celebre estará subordinada a las re- glas *prescritas* por la Comisión."

"Artículo 12.—La Comisión Hípica Insular, podrá *por justa causa previa audiencia de partes y oportunidad de defenderse,* sus- pender temporalmente o revocar la licencia de cualquier hipódromo,. dueño de caballos, *jockey* o cuadrero; *Disponiéndose,* que cualquier resolución de la Comisión Hípica Insular cancelando la licencia de· cualquier hipódromo será apelable para ante la Corte de distrito· del lugar donde esté situado el hipódromo; la apelación no suspen--

derá los efectos de la resolución apelada a menos que la corte de distrito ante la cual se hubiere establecido apelación dictare, previa prestación de fianza, un auto de *supersedeas*. *El procedimiento para esta apelación* será el mismo que rige en la actualidad para las apelaciones de las cortes municipales a las cortes de distrito y las resoluciones dictadas en estos casos por las cortes de distrito serán firmes e inapelables. Los hipódromos podrán hacer reglamentos para su gobierno interior, sujetos a la aprobación de la Comisión Hípica Insular.''

La Ley de 1927 es una recopilación, re-exposición y re-adopción de los 55 artículos de la Ley de 1925. Una minuciosa exposición de este aspecto del caso puede hallarse en la discusión hecha por los letrados de la apelante en la proposición sometida bajo el tercer señalamiento de error en las páginas 14 a 26 de su alegato.

Solamente se emiten tres de los artículos de la Ley de 1925 en la re-adopción de la Ley de 1927. De éstos el más significativo, y a la vez la única omisión que ahora nos concierne, es el artículo 5 de la ley anterior que expresamenete autorizaba la fijación de turnos por la Comisión Hípica Insular.

De las modificaciones envueltas, las más importantes y las que más resaltan como el probable motivo y la única justificación para que se hiciera la aludida revisión, son las indicadas por la referencia que ya hemos hecho a los artículos 3 al 12, inclusive, de la Ley de 1925.

Dos tendencias paralelas pueden notarse más o menos claramente en las leyes sucesivas que antes hemos mencionado. La primera, y tal vez la más obvia de las dos, es la creciente disposición de regularizar y reglamentar directa y detalladamente el negocio de hipódromos por medio de disposiciones estatutorias específicas que cubran el más mínimo aspecto del negocio. La segunda y concomitante fase de esa proposición general en la política legislativa es una inclinación aparente de cercenar las facultades de la Comisión Hípica Insular.

Los rasgos salientes de la enmienda de 1913, son, primero, la ausencia absoluta de cualquier tentativa directa de regularizar o reglamentar las carreras de caballos, y, segundo, el alcance prácticamente ilimitado de los poderes conferidos a la Comisión Hípica Insular tal como fué creada originalmente. El desarrollo gradual, aunque paulatino, de una táctica distinta por la Legislatura, especialmente en lo que atañe a una reglamentación y dominio directos, si no es de por sí aparente, puede ser fácilmente demarcado siguiendo la pista de la legislación sucesiva. Por tanto, bastará señalar algo más específicamente el hilo determinado del cual, a medida que se extiende a través de toda la historia de la Comisión Hípica Insular, dependen principalmente la naturaleza y el alcance de los poderes conferidos a ese cuerpo.

La autoridad conferídale a la Comisión Hípica, al ser creada, de conceder una licencia "si a juicio de la Comisión se hubiere justificado la expedición de la licencia," y de revocar la misma "por cualquier infracción de la referida licencia, o siempre que la Comisión considere que la vigencia de ella no es conveniente a los intereses hípicos," equivalía substancialmente a, y era coexistente con, los amplios poderes discutidos por la Corte de Nueva York en el caso de *People* v. *State Racing Commission* 103 N. Y. S. 955, según lo demuestra el siguiente extracto:

"Si bien la cuestión considerada y resuelta por la corte en el caso de Greenan no era una que pusiera ante el tribunal, para que éste la resolviera directamente, la cuestión de si la autoridad que tenía la Comisión para expedir o negarse a expedirle licencias a una asociación que reuniera los requisitos exigidos por el estatuto, descansaba exclusivamente en la discreción de la Comisión, sin embargo, el razonamiento de la opinión indica el criterio, por lo menos del juez que la emitió y, tal vez, de la corte, de que tal discreción es absoluta y que no se limita a determinar meramente la existencia de tales requisitos. Las palabras usadas en el artículo 6, C. 570, pág. 373, Leyes de 1895, por virtud de las cuales se le confiere autoridad para expedir licencias, tienden a hacer que el ejercicio de esa autoridad sea enteramente discrecional por parte de la

Comisión. El contexto usado no es: 'Si se presenta un caso adecuado para que se expida tal licencia, la Comisión deberá expedirla,' sino que es: 'Si a juicio de tal Comisión se presenta un caso adecuado para la expedición de la licencia, podrá otorgarla.'

"Este punto de vista sobre la discreción absoluta de la Comisión está confirmado por las disposiciones del artículo 7 de la ley, referente a la revocación de las licencias. En ese artículo se le confiere autoridad expresa a la Comisión para revocar una licencia 'si por cualquier razón se considera que la vigencia de la misma no es conveniente a los intereses de un legítimo deporte hípico.' Evidentemente, la palabra 'legítimo' se usa aquí en su sentido amplio, no técnico, y significa 'bueno' o 'propio,' y no meramente ilegal. El acto de considerar—es decir, la conclusión—ha de ser ejecutado por la Comisión en ejercicio de su libre poder discrecional. Los letrados de ambas partes parecen estar de acuerdo con esta interpretación de las disposiciones que confieren autoridad a la Comisión para revocar una licencia. Sería extraño en verdad que se obligara a la Comisión a conceder una licencia a una asociación hípica simplemente porque esa asociación se hubiese organizado formalmente y hubiese construido una pista, de acuerdo con las dimensiones fijadas por la ley; y que entonces, en virtud de queja del *Jockey Club*, la Comisión pudiese revocar tal licencia sencillamente porque creyera que la continuación de la misma no era conveniente a los intereses de un legítimo deporte hípico. Creo que la expresión 'a juicio de la Comisión' que aparece en el artículo 6 de la ley bajo el epígrafe relativo a la expedición de las licencias, implica una discreción tan absoluta para conceder o denegar una solicitud de licencia, como la disposición en el artículo 7 expresa una absoluta discreción para revocarla."

Las disposiciones al efecto de que la Comisión Hípica estará facultada para "prescribir las reglas, reglamentos y condiciones," y de que toda carrera que en virtud de una licencia se celebre "estará subordinada a las reglas, reglamentos y condiciones que de tiempo en tiempo prescribiere la Comisión," y de que la negativa de "asignar a una corporación o asociación hípica por lo menos cuarenta días en cada año," deberá estar sujeta a revisión por los tribunales, son muy similares a los estatutos de Kentucky que fueron interpretados por una Corte de Circuito Federal en el caso

de *Grainger* v. *Douglas Park Jockey Club*, 148 Fed. 514. De la opinión en ese caso tomamos el siguiente extracto (bastardillas nuestras):

"Parecería que *la Comisión tiene poder, no sólo para conceder licencias, sí que también para asignar y fijar las fechas en las cuales pueden celebrarse carreras con arreglo a las mismas,* facultades que no tienen que ejercerse simultáneamente, sino que pueden ejercerse sucesivamente; caso en el cual, sin embargo, la facultad de asignar y fijar fechas se ejercerá con sujeción al ejercicio de la facultad para conceder licencias. *No hay disposición expresa a este efecto.* Si tiene tal facultad, ha de inferirse del *disponiéndose* del artículo 3, o sea, la segunda de las cláusulas que tratan sobre revisión por las cortes, que la ley, por alguna razón, contiene, y en la cual se dispone que no solamente la negativa de la Comisión para conceder una licencia o la revocación de la misma estarán sujetas a ser revisadas por los tribunales del estado, sino que también lo estará la negativa a asignar a cualquier asociación hípica por lo menos cuarenta días durante cada año para celebrar carreras, si la asociación así lo deseare. Si la ley ha de interpretarse en el sentido de conferir tal poder, en adición a la facultad de conceder licencias, entonces, desde luego, la ley prohibe la celebración de carreras por una asociación que tenga una licencia en cualquiera otra fecha que aquellas asignadas por la Comisión.

    ✻    ✻    ✻    ✻    ✻    ✻    ✻

"Aparte de la facultad de prescribir las reglas, reglamentos y condiciones bajo los cuales se celebrarán las carreras, . . . la ley confiere a la Comisión la facultad de conceder y revocar licencias y de asignar y fijar fechas en las cuales puedan celebrarse carreras con arreglo a las licencias. Es cierto que no se confiere facultad expresa para asignar o fijar fechas, a menos que esté inclusa en la facultad de prescribir tales reglas, reglamentos y condiciones, sobre lo cual tenemos serias dudas. Pero creemos que tal facultad puede deducirse de la segunda disposición relativa a la revisión por los tribunales, contenida en el *disponiéndose* del artículo 3 que dispone que la negativa de asignar por lo menos 40 días en cada año, estará sujeta a revisión por las cortes, y la Comisión, por la forma en que está redactada la licencia adoptada por ella, parece que así ha interpretado la ley.

"El poder para conceder licencias ha de ser ejercido cuando 'a juicio de la Comisión se hubiere justificado la expedición de la misma.' Debe ejercerse el poder para revocar una licencia al 'in-

fringirse cualquiera de las reglas, reglamentos y condiciones prescritos por la Comisión, o siempre que ésta considere que la vigencia de esa licencia no es conveniente a los intereses de un legítimo deporte hípico'.''

Si tal como fué enmendada en 1913 la ley hubiese permanecido sin ser alterada, tal ves no hubiese surgido la presente controversia. Sin embargo, desde 1923, una licencia expedida por la Comisión Hípica Insular, por lo menos por sus propios términos, no es revocable en virtud de cualquier infracción de ''las reglas, reglamentos y condiciones que de tiempo en tiempo prescribiere la Comisión,'' o ''siempre que la Comisión considere que la vigencia de ella no es conveniente a los intereses hípicos,'' sino que lo es solamente ''por justa causa.'' Si la infracción a la condición especificada en la licencia o el perjuicio a los intereses del deporte hípico, equivalen o no a ''una justa causa'' en determinado caso, es una cuestión distinta.

En la Ley de 1923 no se hace referencia alguna a la posible negativa por parte de la Comisión ''de asignar a una corporación o asociación hípica por lo menos cuarenta días en cada año si se deseare, para celebrar carreras por dicha asociación.'' Por el contrario, se exige expresamente que la Comisión Hípica designe un número de determinados funcionarios ''para cada hipódromo en que se celebran carreras.'' Aquí, la posibilidad prevista anteriormente de que la Comisión Hípica fijará fechas o turnos para la celebración de carreras, y la autoridad implícita a este respecto, quedan substituidas por la disposición terminante de que dicha Comisión nombrará tantos jurados y funcionarios del hipódromo como hipódromos haya en funcionamiento simultáneo.

La indicación de tal funcionamiento simultáneo no excluye, necesariamente, la posibilidad de fijar los turnos, si en otra parte de la ley se autorizaran. Además, es muy concebible que el pensamiento que predominó en la mente del legislador en el año 1923 fué más bien en el sentido de eliminar la revisión por las cortes de la negativa por parte de

la comisión de conceder licencias o la cancelación de las mismas, que en el de derogar cualquier autoridad implícita relativa al establecimiento de turnos alternados. No obstante, aún permanece el hecho de que se omitió la cláusula de la cual tal autoridad podría inferirse razonable y satisfactoriamente. Ni la corte de distrito ni este tribunal tienen autoridad para suplir esa omisión, ya se debiera la misma a inadvertencia o a alguna otra cosa.

La Ley de 1925 dice prácticamente que la frase "la celebración de carreras" incluirá "todo aquello que se relacione con la forma en que deberán hacerse las apuestas en las bancas alemanas y *pools,* y todo lo que se relacione con la inscripción de caballos en el *studbook.*" No dice que la frase "la celebración de carreras" incluirá igualmente todo lo relativo a turnos o las fechas en que las carreras se celebren en los distintos hipódromos explotados por empresas competidoras. No obstante, la Legislatura, en 1925, procedió bajo la teoría de que "la facultad para prescribir las reglas y condiciones por las cuales deba regirse la celebración de carreras" no incluía el poder "para fijar turnos para la celebración de carreras." De lo contrario, debe considerarse que deliberadamente hizo algo en vano e inútil al disponer, como dispuso, por los términos de un artículo nuevo e independiente de la ley, que:

"Asimismo se faculta a la Comisión Hípica Insular para fijar turnos para la celebración de carreras cuando existan dos o más hipódromos dentro de una misma municipalidad."

De acuerdo con este artículo se verá que la clara intención de la Legislatura fué dejar a la Comisión Hípica a su libre albedrío en lo relativo a las apuestas en los hipódromos y a la inscripción de caballos en el registro (*studbook*), en todo aquello en que la nueva adopción de las varias leyes anteriormente mencionadas no abarcara adecuadamente la materia. Es igualmente claro que con este artículo la Legislatura trató de restablecer la autoridad implícita contenida en las

disposiciones referentes a la negativa "de asignar a una corporación o asociación hípica por lo menos cuarenta días en cada año," que aparecía en la enmienda de 1913, y que fué omitida en la Ley de 1923. Además, también se le da autoridad a la Comisión para imponer correctivos por la infracción de su reglamento. Se autoriza a los miembros de la comisión a tomar juramentos, pero ésta debe "seguir en sus investigaciones y actuaciones los procedimientos señalados en la ley a las cortes de justicia para la tramitación y despacho de sus asuntos."

Por otra parte, bajo acápites separados y después de disponerse "el nombramiento de funcionarios para las carreras y empleados de la Comisión Hípica Insular," la Legislatura, en 1925, trata independientemente la cuestión de "imposiciones (*granting*) y pago de licencias," con el título como corolario de "revocación o suspensión temporal de las licencias." De acuerdo con la Ley de 1925, la expedición de una licencia no depende de si *"a juicio de la Comisión* se hubiere justificado la expedición de la licencia." La Ley de 1925 no dice que la Comisión *"podrá otorgar"* la licencia por el término de un año ni de que toda licencia "contendrá la condición de que toda carrera que en virtud de la misma se celebre estará subordinada a las reglas y condiciones que de tiempo en tiempo prescribiere la Comisión." La letra de la ley ha dejado de ser permisiva y directoria. Es terminante e imperativa. Cuando un solicitante *"llenare los requisitos que, por reglamento, exigiere la Comisión, ésta le otorgará la licencia por el término de un año mediante el pago* de la suma de trescientos ($300) dólares." La condición contenida en la licencia no es la del año 1923, "de que toda carrera que en virtud de la misma se celebre, estará subordinada a las reglas y condiciones que de tiempo en tiempo prescribiere la Comisión," sino que la condición ahora es "que toda carrera que en virtud de la misma se celebre estará subordinada a las reglas prescritas por la comisión."

Del requisito sobre la "justa causa," ya no puede deducirse la necesidad de que se celebre una vista ni de que se dé la oportunidad de defensa. La justa causa se hace expresamente un requisito previo indispensable para la suspensión temporal y para la revocación de una licencia.

El artículo 5 de la Ley de 1927 contiene un recordatorio sutil, que sería manifiestamente superfluo, excepto por vía de admonición, de que los reglamentos adoptados por la comisión estarán en todo tiempo sujetos a ser revisados o revocados por la Asamblea Legislativa. El artículo 6 hace que las decisiones de la comisión en cuanto a correctivos y castigos por infracciones de su reglamento sean inapelables, a menos que se trate de la "expulsión definitiva o de la suspensión temporal por un período de tres o más meses, de los caballos, sus dueños, *jockeys, trainers,* cuadreros o cualquiera de ellos. El aspecto interesante es que se estatuye un recurso de apelación y un juicio *de novo* en la corte de distrito en todos aquellos casos que caigan dentro de la excepción últimamente mencionada. Nuevamente, se establece expresamente un recurso similar en el *disponiéndose* del artículo 12, *supra.* El resultado general de todo esto no es el que se exima a la comisión de toda intervención judicial. Cuando estén envueltos importantes derechos personales o reales, la ley prácticamente coloca a la comisión creada por ella bajo la revisión y dominio de las cortes de distrito. En todos esos casos, se prescribe que las decisiones de las cortes de distrito serán finales. Nuestra única pena es que tanto las decisiones de la comisión como las de las cortes de distrito no sean finales en todos los casos.

El artículo 6 también dispone que "las sesiones ejecutivas de la comisión serán privadas pero las audiencias que conceda a las partes serán públicas." De suerte que, aun tratándose de casos de investigaciones en que pudiera privarse a la parte perjudicada del recurso de apelación contra una

decisión adversa, la luz de la publicidad ilumina los procedimientos de la comisión.

El artículo 7 dispone el nombramiento por los directores de cada hipódromo de ciertos funcionarios del mismo, que anteriormente eran designados por la comisión. En lugar del precepto anterior sobre el nombramiento por la Comisión Hípica de "todos aquellos otros funcionarios que creyere necesarios para el mejor funcionamiento de las carreras," hallamos el siguiente *disponiéndose:* "que la Comisión Hípica Insular no podrá nombrar ni ordenar a la corporación que nombre para los hipódromos otros empleados en adición a los designados por esta Ley." Ahora se le permite a la Comisión Hípica destituir a cualquiera de los funcionarios del hipódromo nombrado por ella o por la corporación, pero sólo puede hacerlo "por ineficiencia en el cumplimiento de su deber o mala conducta en el desempeño de su cargo," después de suministrarle "una copia de los cargos que existan contra él y una oportunidad de ser oído en persona o por medio de abogado en su propia defensa dentro de los diez (10) días siguientes a la fecha de la notificación de los cargos."

El artículo 5 de la Ley de 1925 brilla por su ausencia en la Ley de 1927.

"Cuando se revisa un estatuto y se omiten algunas partes de la ley original, no se pueden revivir, mediante interpretación judicial, las partes que han sido omitidas, sino que debe considerarse que han sido anuladas, siempre que aparezca claramente que fué la intención de la Legislatura cubrir toda la materia al hacer la revisión." 36 Cyc 1080 y 1081.

En el caso de *Pirie* v. *Chicago Title & Trust Co.,* 182 U. S. 438, la Corte Suprema de los Estados Unidos, por voz del Juez Asociado Sr. McKenna, dijo, refiriéndose a una situación algo similar a la que estamos considerando, lo siguiente:

"¿Carecía de finalidad la omisión? Es claro que omitir una

condición no es lo mismo que expresar una condición. ¿Suprimiéronse las palabras en que estaba vertida para ser repuesta por medio de interpretación? ¿O se quitó de la certeza que le dieron el uso y las decisiones anteriores para ser puesta en duda o en controversia? Existe una presunción en contra de esto. Cuando perduran los fines de una ley anterior, generalmente también deben perdurar sus términos; y la omisión de sus términos implica la omisión de sus fines. Esta regla fué aplicada últimamente en el caso de *Bardes* v. *First National Bank of Hawarden,* 178 U. S. 524. En ese caso, al determinar si la jurisdicción de las cortes de circuito y de distrito de los Estados Unidos era concurrente con la de las cortes de los estados en ciertos pleitos en ley y en equidad entre el adjudicatario y otro reclamante de los bienes del quebrado, las leyes de 1841 y 1867 fueron equiparadas con la Ley de 1898, y, en vista de la omisión en esta última de ciertos preceptos contenidos en las leyes anteriores, se resolvió que tal jurisdicción no existía. El tribunal dijo, por voz del Juez Asociado Sr. Gray: 'Nos es imposible inferir que cuando el Congreso, al redactar la ley de 1898, omitió por completo tal disposición o una similar, y sustituyó los preceptos restrictivos del artículo 23, lo hizo con la intención de que cualquiera de·estas cortes retuviera la jurisdicción que tenía de acuerdo con la disposición suprimida'.''

En una nota sobre el caso de *Sumption* v. *Rogers,* Ann. Cas. 1915 B, página 622, se citan numerosos casos británicos y americanos en apoyo de la doctrina de que:

"Ha quedado bien establecida la regla de que cuando el significado de una ley es dudoso, puede acudirse a una ley anterior que trate sobre el mismo asunto y que haya expirado o haya sido derogada, con el fin de resolver la duda.''

El editor hace referencia al caso de *Lockwood* v. *District of Columbia,* 24 App. Cas. (D. C.) 569, manifestando que era ''aparentemente el único caso que no compartía el criterio anteriormente expuesto.''

También se cita el caso de *Converse* v. *United States,* 21 How. 463, así como dos decisiones estaduales en el sentido de que resuelven lo siguiente:

"Puede compararse una serie de leyes sobre la misma materia con el fin de descubrir la política de la Legislatura con respecto a esa materia.''

Se cita un número de casos de estados y federales como autoridades que sostienen la siguiente manifestación:

"Cuando se ha derogado una parte de determinada ley, esa parte puede utilizarse para explicar las disposiciones de la parte que se ha retenido."

Desde luego que es igualmente cierto, según se indica en la misma nota que:

"Cuando un estatuto es claro por su propia faz, y al hallarse aisladamente es razonablemente susceptible de una sola interpretación, las cortes adoptarán esa interpretación y se negarán a considerar estatutos anteriores sobre la misma materia."

Sin embargo, en el presente caso, por la misma razón que impelió a la Corte de Circuito federal a expresar serias dudas sobre el alcance y el efecto de una disposición parecida del estatuto de Kentucky, o por otra razón similar, no podemos estar de acuerdo con el criterio de que el artículo 5 de la Ley de 1927 "es claro por su propia faz, y al hallarse aisladamente es razonablemente susceptible de una sola interpretación."

Puede admitirse, para los fines de esta opinión, que en un caso adecuado de poder para reglamentar podría y debería considerarse que incluye el poder para conceder licencias. En la ley que estamos estudiando, sin embargo, la facultad para conceder licencias está definida separadamente y reglamentada y regularizada directamente bajo un epígrafe distinto e independiente, en otros artículos de la misma ley. Podría ser, según alegan los letrados de la interventora en relación con este aspecto del presente caso, que el efecto lógico o resultado práctico de la regla que establece los turnos alternados fué suspender provisionalmente y de tiempo en tiempo, la licencia que anteriormente le había sido expedida a la peticionaria. Pero no se desprende de ello que la actuación de la Comisión Hípica de que se queja la peticionaria, equivalía a una suspensión temporal de tal licencia "por justa causa, previa audiencia de partes y oportunidad de defen-

derse,'' dentro del espíritu del artículo 12 de la ley. Aparentemente, tampoco se le ha ocurrido a ninguna de las partes interesadas, que en el artículo 8 pueda hallarse cualquier autoridad implícita que tuviera la comisión para fijar turnos alternados.

Por tanto, no necesitamos especular acerca de hasta qué punto podría ser afectada la interpretación del artículo 5 por el hecho de que la Legislatura dejara de referirse en cualquier otro artículo a la cuestión de licencias, incluyendo la autoridad para concederlas, suspenderlas y revocarlas.

Además, en el presente caso tenemos la interpretación contemporánea que ya le había dado la Legislatura misma al artículo 4 de la Ley de 1925, el cual constituye el prototipo inmediato del artículo 5 de la Ley de 1927. Evidentemente, la Legislatura no creyó en 1925 que la concesión de la ''facultad para prescribir las reglas y condiciones por las cuales deba regirse la celebración de carreras en Puerto Rico'' fuera adecuada para conferir a la Comisión Hípica la autoridad para establecer turnos alternados. Bajo estas circunstancias, no deseamos imputar a los que redactaron ambas leyes la intención de usar, al tiempo de adoptar nuevamente el artículo 4 de la Ley de 1925 como el artículo 5 de la Ley de 1927, la palabra ''reglamentos'' en el sentido de que tenía un significado más amplio que las palabras ''reglas y condiciones,'' que hemos interpretado en la forma anteriormente expuesta.

Si a más de la consideración que antecede, se examina el artículo 5 de la Ley de 1927 a la luz de su historial tal como ha sido reseñada en esta opinión, culminando en la omisión del artículo 5 contenido en la Ley de 1925 al ser revisada en 1927, inevitablemente se llegará a la conclusión de que la Legislatura, en 1927, no tuvo la intención de conceder implícitamente a la Comisión Hípica la misma autoridad que anteriormente había sido objeto de una concesión expresa.

◼ Tanto la comisión demandada como la interventora

han radicado mociones para que se desestime la presente apelación. La vista de estas mociones se celebró, reserván-dose el tribunal su fallo, al tiempo que el caso fué discutido y sometido sobre sus méritos. El fundamento alegado en cada caso es que la cuestión envuelta en el presente litigio se ha convertido en una de carácter académico, por el hecho de que la licencia expedida a la peticionaria de acuerdo con la Ley de 1925, expiró el 14 de septiembre de 1927, o sea, dos días después de haberse radicado el escrito de apelación en el presente caso. Nos inclinamos a estar de acuerdo con los letrados de la apelante en que el presente pleito puede y debe distinguirse de los de *Lewis Publishing Co.* v. *Wyman,* 182 Fed 13; *Yent* v. *State,* 49 L.R.A. (N. S.) 1204, y otros más citados por los abogados de la interventora, por virtud del principio enunciado por la Corte Suprema de los Estados Unidos en los casos de *Boise City Irr. & Land Co.* v. *Clark,* 131 Fed. Rep. 415, y *Southern Pacific Terminal Co.* v. *Inter-state Commerce Commission and Young,* 219 U. S. Rep. 514. De todos modos, la presente controversia difícilmente podría considerarse como académica, en vista del pronunciamiento de costas, del señalamiento de error a este respecto y de las dos fianzas prestadas por la peticionaria a fin de obtener una orden de entredicho provisional (*temporary restraining order*) y el *injunction* preliminar en la corte inferior.

Con la excepción previa interpuesta por la interven-tora en la corte inferior se levantó una cuestión más seria que ha sido suscitada nuevamente por la representación legal de la interventora en la presente apelación. Se alega que ni la licencia expedida a la peticionaria en septiembre 14 de 1926 ni ningún derecho adquirido por la peticionaria con arreglo a la misma, sobrevivieron la derogación de la Ley de 1925 por la de 1927, la que empezó a regir el 4 de mayo de 1927, o sea, más de dos meses antes de que la Comisión Hípica Insular adoptara la regla que provocó esta contro-versia. No hay duda alguna en cuanto a la tendencia general

de la ley sobre este punto. La única cuestión a considerar a este respecto es si los hechos en el presente litigio lo hacen caer dentro de una excepción a la regla general, más bien que dentro de la regla misma. La regla a que ya nos hemos referido y la única excepción a la misma que parece haber sido reconocida en algún caso están expuestas en 37 C. J. 214 en la siguiente forma:

"Todos los privilegios concedidos por la licencia y la protección otorgada por la misma, aunque ésta no haya vencido, generalmente quedan cancelados y revocados por la derogación de la ley que autorizó su concesión, a menos que la licencia, a pesar de haber sido obtenida con arreglo a la ley derogada, sea igual a la exigida por la nueva ley."

No tenemos acceso al único caso citado por el texto en apoyo de la excepción, pero ella nos parece razonable, y los hechos en este caso muy bien lo hacen caer dentro de tal excepción.

Otra indicación es que la peticionaria tenía un remedio adecuado y completo en el curso ordinario de la ley. El remedio a que se hace referencia es la disposición relativa a la apelación de "cualquier resolución de la Comisión Hípica Insular cancelando la licencia de cualquier hipódromo," contenida en el artículo 12 de la Ley Hípica. Los señores letrados admiten la existencia de una duda respecto a si procedería o no una apelación contra una orden de suspensión temporal. Es aun más dudoso si una corte de distrito estaría o no dispuesta a expedir un auto de *supersedeas* al apelarse de una orden de suspensión temporal. Es más que razonable asumir en favor de la peticionaria que, la distinción que habría que hacer entre la "suspensión temporal por un período de tres o más meses" y la "expulsión definitiva" de que habla el artículo 6, *supra*, podría influir, hasta cierto punto, en el ánimo del juez de distrito. De todos modos, aún quedaría una cuestión más seria y fundamental respecto a si el mero hecho de fijar turnos debe considerarse no solamente como una suspensión temporal de la licencia en cues-

lión, sino también como una cancelación total o parcial de la misma, "por justa causa," dentro del significado de esa frase según se usa en el artículo 12.

"Es un principio de equidad establecido por la jurisprudencia que si el recurso en derecho és dudoso, una corte de equidad no se negará a conocer del asunto . . . Cuando un tribunal de equidad puede conceder el remedio solicitado, no debe obligarse al demandante a especular sobre la posibilidad de obtener el remedio siguiendo el curso ordinario de la ley." Davis v. Wakelle, 156 U. S. 680, 688.

Los abogados de la interventora también alegan que la peticionaria perdió cualquier derecho que pudiera tener a que se le expida un *injunction* permanente, al solicitar y obtener una nueva licencia de acuerdo con el nuevo reglamento, poco después de dictarse la sentencia declarando sin lugar la petición en la corte inferior. En la solicitud para que se le expidiera una nueva licencia se desmentía expresamente cualquier intención por parte de la peticionaria de reconocer la validez de la regla fijando turnos, y específicamente la solicitante se reservó el derecho de atacar y de determinar la validez de esa regla, ya fuera mediante el presente recurso de apelación o por virtud de pleitos posteriores. Sin embargo, los letrados insisten en que la peticionaria, después de obtener y aceptar una licencia otorgada de conformidad con los reglamentos existentes, y sujeta expresamente a la condición de que se cumpliera con los mismos, no puede invocar consistentemente la ayuda de una corte de equidad. No se discute en los alegatos la cuestión de si la condición incorporada en la licencia, al efecto de que "toda carrera que a virtud de la misma se celebre, estará subordinada a las reglas prescritas por la comisión," sólo prevé reglas razonables y válidas, excluyendo así requisitos irrazonables y *ultra vires*.

Es algo más persuasiva aquella parte del argumento que procede sobre la teoría de un cambio en la situación que afecta la discreción o la facultad de este tribunal para expedir

ahora un auto permanente. En los alegatos no se desarrolla este punto en forma adecuada, y, por el momento, no emprenderemos una investigación independiente sobre sus méritos. Si no hubiese sido por el elemento de causa y la consiguiente necesidad de revisar cuestiones que fueron discutidas y resueltas por la corte inferior, tal vez habríamos llegado a una conclusión distinta en cuanto al punto levantado por las mociones para desestimar esta apelación. No nos conciernen por ahora los méritos intrínsecos de cuestiones que surgen después de haberse dictado la sentencia apelada, y que no fueron consideradas por la corte inferior ni afectan en forma alguna el resultado de la apelación en lo que a una mera confirmación o revocación de la sentencia se refiere.

Si la revocación debiera ir acompañada de la expedición de un auto permanente, o si el caso debiera ser devuelto para ulteriores procedimientos no incompatibles con esta opinión, es otra cosa. Respecto a este extremo, tomándolo todo en consideración, estamos dispuestos a darle a la interventora el beneficio de una duda muy seria.

*Debe revocarse la sentencia recurrida.*

El Juez Asociado Sr. Texidor no intervino.